# Exhibit I

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

---

TUG BLARNEY LLC, a Washington )
limited liability company;    )
Douglas Hilty, an individual; )
Ed Lyda, an individual; Roger )
Kenoyer, an individual; and   )
Nick Humlick, an individual,  )
                              )
        Plaintiffs,           )
                              )
    V.                        )
                              )
RIDGE CONTRACTING, INC., an Alaska )
corporation, in personam,     )
                              )
        Defendant.     ) In Admiralty
_____)
               ) 3:12-CV-00097-SLG
RIDGE CONTRACTING, INC., an Alaska )
corporation, in personam,     )
                              )
        Third-party          )
Plaintiff,                    )
                              )
    V.                        )
                              )
C&K MARINE LLC, an Alaska limited )
liability company,            )
                              )
        Third-Party          )
Defendant.                    )
_____)

Deposition Upon Oral Examination of
R. RUSSELL JOHNSON

---

June 20, 2013
1191 Second Avenue, Suite 1900
Seattle, Washington
Leslie M. Sherman, RMR, CRR, CSR 2629

## Page 2

1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4       MARKOS SCHEER
          Attorney at Law
5         mscheer@ydnlaw.com
          Young deNormandie
6         Second & Seneca Building
          1191 2nd Avenue, Suite 1901
7         Seattle, Washington  98101
          206-224-9818
8
9
10   FOR THE DEFENDANTS AND THIRD-PARTY PLAINTIFFS:
11      LARRY E. ALTENBRUN
          Attorney at Law
12        laltenbrun@nicollblack.com
          Nicoll Black & Feig
13        1325 Fourth Avenue, Suite 1650
          Seattle, Washington  98101
14        206-838-7555

## Page 3

1              E X A M I N A T I O N   I N D E X
2    EXAMINATION BY:                    PAGE
3    Mr. Scheer                         4, 146
4    Mr. Altenbrun                      143
5
6
7              E X H I B I T   I N D E X
8    NUMBER:                            PAGE
9    1   Captain R. Russell Johnson, C.V.    12
10   2   Supplemental Opinion Report, 6-13-13   19
11   3   Opinion Report, 3-21-13            46
12   4   3-27-13 Letter, David DeVilbiss to    119
         Mark Scheer

## Page 4

1    Whereupon,
2            R. RUSSELL JOHNSON,
3    having been duly sworn was called as a witness herein,
4    and was examined and testified as follows:
5
6              E X A M I N A T I O N
7    BY MR. SCHEER:
8        Q.  Mr. Johnson, if you would please say your
9    name and spell it for the record.
10       A.  Sure.  It's -- full name is Robert Russell
11   Johnson, that's R-O-B-E-R-T, R-U-S-S-E-L-L, and
12   J-O-H-N-S-O-N.
13       Q.  And from your CV and the number of cases
14   that you have testified as an expert in, it would
15   appear to me that this is not your first deposition?
16       A.  It's not.
17       Q.  How many depositions do you think you have
18   been involved in, that you have been the deponent?
19       A.  Possibly 15 or more.
20       Q.  Okay.
21       A.  I think that's around.  In the last five
22   years, or total?
23       Q.  Total.
24       A.  Oh, easy then 20.
25       Q.  So then you understand the rules, then,

1 (Pages 1 to 4)

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989
Exhibit I - Page 1 of 3

Page 17

1　　A.　Correct. It means I still had my hand in
2　the day-to-day running of a tug boat, and that's the
3　only reason why it's in that particular seagoing
4　experience paragraph.
5　　Q.　But while you were a manager were you also
6　at the wheelhouse?
7　　A.　I was at times, emergency relief. Basically
8　during the Crowley days it was more in the training
9　and evaluation of our captains, and occasionally I'd
10　have to do a piloting job for a more inexperienced
11　captain, into some port that he hadn't been into
12　before.
13　　Q.　I see. Are you also a licensed pilot?
14　　A.　I am not.
15　　Q.　So from '94 to '97 you were a vessel master
16　with Dunlap. So, during that period you were the
17　master on tug vessels, or other vessels?
18　　A.　Yes; tug master.
19　　Q.　Okay.
20　　A.　No shoreside responsibilities at that time.
21　　Q.　Just running the boat?
22　　A.　Just running a boat.
23　　Q.　And during that period, running the boat
24　meant operating tugs which were towing barges, other
25　material, in Alaska, the West Coast of the United

Page 18

1　States and Hawaii?
2　　A.　Correct.
3　　Q.　Let's see. '97 to 2000 you were a vessel
4　master, pilot training for Harley Marine Services. It
5　says "master of various company vessels." Were those
6　primarily tugs as well?
7　　A.　Always tugs.
8　　Q.　Always tugs, okay. Acting as a master?
9　　A.　Acting as a master, both as a master and a
10　manager responsible for training and evaluation.
11　　Q.　So you had shoreside --
12　　A.　I had shoreside duties at that time as well.
13　　Q.　And during that Harley Marine Services
14　period what was the ratio of your shoreside versus
15　wheelhouse time?
16　　A.　I think during that time I probably had at
17　least six months purely as a captain during those
18　three years. Just an estimate.
19　　Q.　Okay.
20　　A.　I have to see my see records to --
21　　Q.　And then 2000 to 2012, you worked for Dunlap
22　Towing, and it appears that you spent some time in the
23　wheelhouse and also spent some time on the beach as an
24　evaluator and a trainer, is that right?
25　　A.　That's correct.

Page 19

1　　Q.　Do you have an idea what your comparative
2　beach versus wheelhouse time during that period was?
3　　A.　Oh, I doubt that I spent more than -- much
4　more than 5 percent of my time on the boats. Probably
5　95 to 5 percent.
6　　Q.　Okay. And during the period that you worked
7　for Harley Marine services, 1997 to 2000, is that the
8　period that you came into contact and operated the Tug
9　Aries?
10　　A.　Yes.
11　　Q.　Harley Marine Services, at that time Harley
12　Marine Services owned the Aries?
13　　A.　Yes. They had just purchased it.
14　　Q.　No time like the present, we might as well
15　have a discussion about the Aries while we're at it.
16　　　　(Marked Deposition Exhibit 2.)
17　BY MR. SCHEER:
18　　Q.　You have been handed what's been marked
19　Exhibit 2. It's been described as a Supplemental
20　Opinion Report. So, Mr. Johnson, is this a document
21　that you drafted?
22　　A.　It is.
23　　Q.　And it says here that you have been asked to
24　provide a supplemental opinion regarding the
25　circumstances surrounding the sinking of the Tug Aries

Page 20

1　　A.　Correct.
2　　Q.　In my mind, that sentence is a bit
3　ambiguous. Can you tell me exactly what you were
4　asked to render an opinion about?
5　　A.　I agree it is ambiguous. Particularly with
6　my familiarity with the Aries, whether at the time
7　that I had sailed on the vessel, whether it was a
8　seaworthy vessel, and whether it was capable of
9　operating in the kind of conditions, the weather
10　conditions that was operating in that particular
11　voyage.
12　　Q.　And based on your experience, survey, at
13　least between 1997 and 2000, would you agree that the
14　Aries was a seaworthy vessel?
15　　A.　At the time that I sailed aboard it, it was,
16　in my experience with it.
17　　Q.　And capable of towing a 240-foot barge laden
18　with cargo?
19　　A.　It was.
20　　Q.　So in this Supplemental Opinion Report
21　marked as Exhibit No. 2, it says, "I am very familiar
22　with the Tug Aries having participated in its survey,
23　dry docking, and purchase in Houma." Is that
24　H-O-U-M-A?
25　　A.　Yes.

5 (Pages 17 to 20)

Page 21

1　　**Q. Did I pronounce it correctly, Houma?**
2　　A. "Hoe-ma," I always said "hoe-ma."
3　　**Q. Houma. So you went down to Louisiana --**
4　　A. I don't have quite the accent that they
5　would have on it down there in Louisiana.
6　　**Q. Few of us do. So, you went down to**
7　**Louisiana. Were you the company representative that**
8　**went down to basically look at the boat and confirm**
9　**whether or not it was as represented and whether you**
10　**wanted to acquire it?**
11　　A. I was. But my primary interest actually at
12　the time actually was the barge, not the tug. It was
13　a double-hulled barge, and Harley was very interested
14　in getting a double-hulled barge for his bunker
15　operations on the West Coast.
16　　**Q. Oh, I see. Okay. So, but was it kind of a**
17　**package deal?**
18　　A. Yeah. It was kind of a, geez, as long as
19　you are going to buy this barge, you know, instead of
20　getting somebody to tow it around for you, why don't
21　you just buy this tug, too. That way you've got a tug
22　to tow it around.
23　　**Q. You've only got a one-way trip.**
24　　A. Yes.
25　　**Q. That makes a lot of sense. So when you went**

Page 22

1　**down for the trip to acquire the Aries, you personally**
2　**conducted a survey of the Aries before acquisition?**
3　　A. We had a surveyor. We hired a surveyor to
4　do the survey work on the barge and the tug. And I
5　accompanied him on the survey of the barge and the
6　tug.
7　　**Q. Oh, you went through the boat. You went**
8　**through both of them with the surveyor?**
9　　A. Yes.
10　　**Q. If you could wait until I finish it would be**
11　**very helpful. You are just jumping in just a little**
12　**bit. It might be easier for her to write it down if**
13　**you just pause.**
14　　A. Sorry.
15　　**Q. No worries. So, what was your opinion at**
16　**that time of the Aries as a vessel?**
17　　A. Well, I was comfortable with sailing it all
18　the way around to the West Coast, so I was comfortable
19　with the fact that it would get us safely there. I
20　think that says it all.
21　　**Q. I think it kind of does say it all. So, and**
22　**that voyage would --**
23　　A. Not that I necessarily wanted to make the
24　trip, but I got kind of talked into it, so.
25　　**Q. So you took the boat and the barge under tow**

Page 23

1　**and you went around through the Panama Canal and came**
2　**up the West Coast with it?**
3　　A. Yes.
4　　**Q. And during that operation it says that you**
5　**ran about, almost 4400 miles?**
6　　A. Correct.
7　　**Q. And you encountered winds up to 35 knots and**
8　**seas to 12 feet during the voyage?**
9　　A. That's my recollection.
10　　**Q. And the tug was suitable and performed well**
11　**in those conditions?**
12　　A. It did.
13　　**Q. And, let's see. In the second, or the third**
14　**paragraph of your Supplemental Opinion Report marked**
15　**as Exhibit No. 2, you state, "The sinking of the Aries**
16　**was an unfortunate event and the cause at this time is**
17　**pure speculation." That's your language?**
18　　A. It is.
19　　**Q. And, pure speculation that there is -- you**
20　**have no knowledge of any specific facts or**
21　**circumstances which would lead you to believe that**
22　**there was a certain cause as to why the Aries went**
23　**down on that fateful day?**
24　　A. I have no knowledge of any direct
25　information.

Page 24

1　　**Q. Do you know Roger Morris, the marine**
2　**surveyor?**
3　　A. The name is familiar, but it doesn't -- I
4　can't place him right off the bat.
5　　**Q. Have you been asked --**
6　　A. Is he the guy who did the survey of the
7　Aries? To answer your question, I saw the survey, but
8　I don't recognize the guy.
9　　**Q. So you have reviewed the survey of the**
10　**Aries?**
11　　A. I have. It's in my file that I just gave
12　you.
13　　**Q. When did you review the survey of the Aries**
14　**that Roger Morris had conducted in 2011?**
15　　A. Within the last week.
16　　　MR. ALTENBRUN: Was that question meant for
17　when did you most recently review it, or when did you
18　first review it, or both, or either, or what?
19　BY MR. SCHEER:
20　　**Q. Well, was that the most recent review, or**
21　**had you reviewed it prior to that?**
22　　A. I just -- I received it, first received it
23　within the last week.
24　　　MR. ALTENBRUN: Okay. I didn't realize
25　that. I thought I gave it to you months ago. Sorry,

6 (Pages 21 to 24)